2009 WY 19

**Corrine L. SHEAFFER, Appellant (Plaintiff),**

v.

**STATE of Wyoming ex rel., UNIVERSITY OF WYOMING, through its BOARD OF TRUSTEES; Richard C. Johnson, Individually; Kevin A. White, Individually; and Bruce Hooper, Individually, Appellees, (Defendants).**

No. S–07–0269.

Supreme Court of Wyoming.

Feb. 18, 2009.

Representing Appellant: Bill G. Hibbler of Bill G. Hibbler, P.C., Cheyenne, Wyoming.

Representing Appellees: Stephen H. Kline of Kline Law Offices, P.C., Cheyenne, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] This is an appeal from summary judgment granted against appellant Corrine Sheaffer ("Sheaffer") and for appellees the State of Wyoming ex. rel. the University of Wyoming ("UW") and its employees Richard Johnson, Kevin White, and Bruce Hooper ("Johnson," "White," and "Hooper"). Sheaffer worked for UW for over twenty-five years. After her involvement in an illicit audio tape incident, UW terminated her employment in February of 2004. The termination precipitated this lawsuit and on appeal, we affirm.

## ISSUES

[¶ 2] Sheaffer presents five issues for review:

1. The third reason proffered by [the University of Wyoming] for terminating [Sheaffer] presents a genuine issue of material fact, thereby reversing summary judgment.

2. The district court erred in granting summary judgment against [Sheaffer's] claim for retaliatory discharge for protected activity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a).

3. The district court erred in granting summary judgment against [Sheaffer's] claim for gender discrimination in violation of 42 U.S.C. §§ 2000e.

4. The district court erred in granting summary judgment against [Sheaffer's] claim for wrongful termination/breach of contract in violation of UniReg 5 and/or 174.

5. The district court erred in granting summary judgment against [Sheaffer's] claim for interference with contract.

## FACTS

[¶ 3] UW employed Corrine Sheaffer for more than twenty-five years. However, in February of 2004, UW terminated Sheaffer from her position as Transportation and Parking Services (TransPark) Manager. UW's position is that Sheaffer was terminated "for cause" pursuant to UW's University Regulation (UniReg) 174 for her role in a secret audio tape recording of a meeting of the UW Traffic Appeals Committee (TAC).

[¶ 4] In 2002, upon assuming the position of TransPark Manager, Sheaffer became interested in the TAC, which granted or denied appeals regarding campus traffic violations. Her interest apparently stemmed from the fact that granting traffic appeals directly affected TransPark's income. As time progressed, Sheaffer expressed periodic dissatisfaction with the TAC to Richard Johnson, her immediate supervisor.

[¶ 5] Sheaffer's main complaints to Johnson centered on the number of appeals that were being granted and a general lack of consistency in the handling of the appeals. There was a generalized perception by Sheaffer that the members of the TAC were biased in favor of faculty, administration, and student athletes. Along with those complaints, Sheaffer's employee, Paul Kunkel, added his own concerns. According to Kunkel, TAC appellants who came to the "red house" [1] to discuss their appeals were able to overhear portions of the meeting

1. The "red house" is a small building on the north side of the UW campus where the TAC held its meetings.

while waiting in the reception area. Along with the appellants, other employees of TransPark could also hear portions of the meeting, and a specific complaint[2] by one employee, Angie Bules, prompted a conversation between Sheaffer, Kunkel, and Sheaffer's assistant, Fred Lorenz.

[¶ 6] During that conversation, Sheaffer, Kunkel, and Lorenz agreed that the only way to make the UW administration react to concerns about the inappropriate behavior of the TAC would be if the administration heard exactly what took place during a meeting of the TAC. They discussed the possibility of secretly taping a meeting of the TAC, and Kunkel said that at the end of the conversation, Sheaffer directed him to purchase a tape recorder and to tape a meeting of the TAC, unbeknownst to the members. Sheaffer admits that she authorized the purchase of a tape recorder, but denies that she directed Kunkel to use the recorder to tape a meeting of the TAC.

[¶ 7] According to Sheaffer's direction, Kunkel purchased a tape recorder on November 4, 2003. After making the purchase, he testified that he hid the tape recorder in the TAC meeting room on November 6, 2003, pressed "record," and exited the room before the meeting began. Indeed, most of the meeting was secretly recorded, including a number of minutes of discussion of current events by members of the TAC as they waited for the meeting to begin. Bob Beck, Kevin White, and Bruce Hooper, the three members of the TAC present that day, had no knowledge that the meeting was being taped.

[¶ 8] After the meeting, Kunkel delivered the tape to Sheaffer. Lorenz and Sheaffer listened to the tape, and when Sheaffer's supervisor, Richard Johnson, returned the following Monday, November 10, 2003, Sheaffer and Lorenz met with him to discuss the TAC's inappropriate behavior and dis-

closed that they had a tape recording of a meeting. Johnson was immediately concerned about the propriety of the secret taping, and the next day, he informed UW attorney Rod Lang and the head of Human Resources of the taping. He then initiated his own investigation of how the tape was made. During that meeting, he talked to Kunkel, who relayed the background of how the tape was made.

[¶ 9] Meanwhile, attorney Lang contacted the Chief of UW Police, Tim Banks, and requested an investigation and that the matter be turned over to the Albany County District Attorney for a determination as to whether or not a crime had been committed. Following the Albany County Attorney's decision to not prosecute anyone, the UW disciplinary investigation also concluded.

[¶ 10] On February 10, 2004, Sheaffer received written notice of UW's intent to terminate her. The notice detailed the reasons for termination and notified Sheaffer of her right to a pre-termination hearing. Sheaffer exercised her right to a hearing and asked for clarification of the decision to terminate. Subsequent to the hearing, Sheaffer appealed her termination through the process set out in the UniRegs. However, Sheaffer withdrew her Petition for Review in exchange for UW's agreement to not contest her claim for unemployment benefits.

[¶ 11] Sheaffer then filed claims of sex and age discrimination and retaliatory discharge with the EEOC. Following a receipt of a "right to sue" letter, Sheaffer brought the instant action alleging six claims for relief on October 26, 2006.[3] The State filed a Motion for Summary Judgment on August 1, 2007, which the district court granted. This appeal followed.

### STANDARD OF REVIEW

 [¶ 12] When we review the granting of a summary judgment,

---

2. Bules complained that while she worked on a computer outside the committee meeting room, she could hear TAC members discussing a particular appellant's case. That appellant happened to be sitting in the reception area with Bules, and both of them could hear remarks about how stupid the appellant had to have been to have committed the violation in question.

3. Sheaffer's initial complaint alleged the following claims for relief: 1. Retaliation/Retaliatory Discharge for Protected Activity in Violation of Title VII; 2. Sex/Gender Discrimination; 3. Age Discrimination; 4. Wrongful Termination/Breach of Contract; 5. Breach of Covenant of Good Faith and Fair Dealing; and 6. Interference with Contract.

[W]e employ the same standards and use the same materials as were employed and used by the trial court. We examine the record from the vantage point most favorable to the party who opposed the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. Summary judgment is appropriate only when no genuine issue as to any material fact exists and the prevailing party is entitled to have a judgment as a matter of law. A genuine issue of material fact exists when a disputed fact, if it were proven, would have the effect of establishing or refuting an essential element of the cause of action or defense which the parties have asserted. We review a grant of summary judgment deciding a question of law de novo and afford no deference to the trial court's ruling.

*Platt v. Creighton,* 2007 WY 18, ¶ 7, 150 P.3d 1194, 1198 (Wyo.2007) (quoting *Black v. William Insulation, Co.,* 2006 WY 106, ¶ 7, 141 P.3d 123, 126–27 (Wyo.2006)).

[¶ 13] We will affirm a grant of summary judgment if it can be sustained on any legal ground appearing in the record. *Lever v. Community First Bancshares, Inc.,* 989 P.2d 634, 637 (Wyo.1999) (quoting *Duncan v. Town of Jackson,* 903 P.2d 548, 551 (Wyo. 1995)).

## DISCUSSION

**Genuine Issue of Material Fact**

[¶ 14] In her first issue on appeal, Sheaffer argues that the third reason given by UW as to why Sheaffer was terminated presents a genuine issue of material fact, requiring reversal of the district court. Specifically, the third reason given by UW regarding Sheaffer's termination was, "Deception and dishonesty in the investigation of the misconduct." Sheaffer contends that it is "implausible" that the district court found that no genuine issue of material fact existed about who said what during the investigation of the taping incident. Specifically, Sheaffer argues that allegations of deception and dishonesty are questions of credibility, and, as such, whether or not she was dishonest to a point resulting in her termination is a question of fact to be determined by a jury. *Cordova v. Gosar,* 719 P.2d 625, 640 (Wyo. 1986). On the other hand, UW asserts that no issue of material fact exists. The question, UW insists, is not whether UW's reasons were wise, fair, or correct, but rather whether it acted in good faith.

[¶ 15] We agree with UW that Sheaffer's argument fails to raise a genuine issue of material fact regarding UW's proffered explanation. Evidence that the employer should not have made the termination decision-for example, that the employer was mistaken or used poor business judgment-is not sufficient to show that the employer's explanation is unworthy of credibility. *Young v. Dillon Companies, Inc.,* 468 F.3d 1243, 1250 (10th Cir.2006); *Simms v. Okla. ex rel. Dep't of Mental Health and Substance Abuse Services,* 165 F.3d 1321, 1330 (10th Cir.1999).

> The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs.

*Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1318 (10th Cir.1999), *overruled on other grounds by National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). *See Sanchez v. Philip Morris, Inc.,* 992 F.2d 244, 247 (10th Cir.1993) ("Title VII is not violated by the exercise of erroneous or even illogical business judgment."); *Kariotis v. Navistar Int'l Transp. Corp.,* 131 F.3d 672, 677 (7th Cir.1997) ("Arguing about the accuracy of the employer's assessment [of plaintiff's performance] is a distraction, because the question is not whether the employer's reasons for a decision are right but whether the employer's description of its reasons is honest."); *Fischbach v. District of Columbia Dep't of Corrections,* 318 U.S.App. D.C. 186, 86 F.3d 1180, 1183 (D.C.Cir.1996) (concluding relevant issue was whether the employer honestly believed in the reasons it offered for not promoting plaintiff and not the correctness or desirability of those reasons).

[¶ 16] Perhaps a reasonable fact-finder could observe all the witnesses and believe Sheaffer's version of the events

surrounding the surreptitious taping. As previously noted, however, that is not the issue. *See Bullington,* 186 F.3d at 1318. What is at issue is whether the evidence of misconduct presented a genuine issue of material fact. Thus, the relevant "falsity" inquiry is whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, or whether plaintiff can show that the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact-finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination. *See Rivera v. City & County of Denver,* 365 F.3d 912, 924–25 (10th Cir.2004). The reason for this rule is plain: Our role is to prevent intentional discriminatory hiring practices, not to act as a "super personnel department," second guessing employers' honestly held (even if erroneous) business judgments. *See Jones v. Barnhart,* 349 F.3d 1260, 1267 (10th Cir.2003).

[¶ 17] Throughout the investigation of the taping, Johnson and UW Vice President Elizabeth Hardin, kept detailed notes of their interviews, meetings, and discussions concerning the potential discipline of Sheaffer. Johnson testified at his deposition about the instances when he felt Sheaffer was dishonest and deceitful during his personnel investigation. He testified that:

1. [Sheaffer] initially did not tell Johnson that an audio tape of the TAC meeting existed.

2. [Sheaffer] originally told him that she taped the TAC meeting herself.

[¶ 18] The written documentation, as well as the testimony of Johnson and Hardin, identically track with the reasoning given to Sheaffer for her termination. The evidence on the record shows that UW-the decision-maker-believed, based upon other employees' reports, that Sheaffer had, in fact, directed the taping. At the very least, UW believed that Sheaffer, as manager, had a direct hand in the taping. We find no evidentiary basis suggesting that UW came to this belief in bad faith. As a result, while UW's conclusion about Sheaffer's conduct may have been off base, we see no basis upon which a rea-

sonable fact-finder could have found that it was not honestly held. Given the facts known to UW at the time, its decision seems reasonable.

■ [¶ 19] Although Sheaffer did not, at the summary judgment stage, have a burden to establish conclusively whether UW's stated reliance on the results of the investigation was pretextual, she was required to "establish that there is a genuine factual dispute with regard to the truth." *Bryant v. Farmers Ins. Exch.,* 432 F.3d 1114, 1126 (10th Cir.2005). Viewing Sheaffer's evidence in the light most favorable to her position, the evidence demonstrates that UW may have been unwise or utilized questionable judgment, but it does not draw into question whether UW actually relied, honestly and in good faith, upon the appearance of improprieties arising from the evidence gathered in the investigations. We will not disturb the district court's ruling on summary judgment on this issue.

### Retaliatory Discharge/Title VII

■ [¶ 20] Sheaffer next argues that UW committed a retaliatory termination against her because she participated in protected activity in violation of Title VII of the Civil Rights Act of 1964—i.e., reporting complaints against the TAC and then providing recorded evidence of the hostile behavior, language, and conduct of the TAC members. UW responds that there is no direct evidence, nor any inference, that it retaliated against Sheaffer because she engaged in any "protected activity."

[¶ 21] Section 704 of Title VII of the Civil Rights Act prohibits an employer from discriminating "against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). Section 703(a) of the Act defines an "unlawful employment practice" as follows:

It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employ-

ment, because of such individual's race, color, religion, sex, or national origin[.] 42 U.S.C. § 2000e–2(a)(1).

[¶ 22] Where a plaintiff cannot produce direct evidence of an employer's discriminatory intent, the plaintiff may prove his case with circumstantial evidence under the burden-shifting scheme of proof established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the instant case, Sheaffer has presented no direct evidence of discriminatory intent on the part of UW. Therefore, she must rely on the *McDonnell Douglas* framework to establish her cause of action for retaliatory discharge and to survive summary judgment. *See Kruzich v. Martin–Harris Gallery, LLC,* 2006 WY 7, ¶ 14, 126 P.3d 867, 872–873 (Wyo.2006) (the *McDonnell Douglas* burden-shifting scheme applies in analyzing retaliation claims under Title VII).

[¶ 23] Under *McDonnell Douglas,* the initial burden falls on Sheaffer to demonstrate a *prima facie* case of retaliatory discharge. *Id.,* ¶ 13, 126 P.3d at 872. If Sheaffer satisfies this initial burden, then a presumption of discrimination arises, and the burden shifts to the employer to produce a legitimate, non-discriminatory reason for its adverse employment action. *Id.*

> If the employer proffers a legitimate reason, the employee then must prove, by a preponderance of the evidence, that the employer's explanation is merely a pretext for unlawful discrimination. At this point, the *McDonnell Douglas* framework, with its presumptions and burden shifting, drops out and the sole issue is whether unlawful discrimination occurred.

*Id.,* ¶ 14, 126 P.3d at 873 (internal citations omitted).

[¶ 24] To establish a *prima facie* case of retaliation, a plaintiff must demonstrate (1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action. *Argo v. Blue Cross & Blue Shield of Kan., Inc.,* 452 F.3d 1193, 1202 (10th Cir.

2006). If a plaintiff is unable to make out a *prima facie* case, judgment as a matter of law is appropriate. *See Aquilino v. Univ. of Kan.,* 268 F.3d 930, 936 (10th Cir.2001) (reversing district court's denial of a post-verdict motion for judgment as a matter of law where court held plaintiff did not suffer from an adverse employment action). To establish the first of these elements—participation in a protected activity—Sheaffer need not prove that the conditions against which she protested actually amounted to a violation of Title VII. *See id.* Rather, she must demonstrate only that she had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. *Love v. RE/MAX of Am., Inc.,* 738 F.2d 383, 385 (10th Cir.1984).

[¶ 25] Protected activities fall into two distinct categories under Title VII's anti-retaliation provision: (1) opposition to an employer's discriminatory employment practices; or (2) participation in an ongoing investigation or proceeding conducted pursuant to Title VII. Under the opposition clause, an employer is prohibited from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). To qualify for protection under the opposition clause, an employee's behavior need not rise to the level of formal charges of discrimination against his employer. *Armstrong v. Index Journal Co.,* 647 F.2d 441, 448 (4th Cir.1981). Protected activity under the opposition clause includes "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Washington Airports Auth.,* 149 F.3d 253, 259 (4th Cir.1998) (citing *Armstrong,* 647 F.2d at 448). To determine whether or not an employee has engaged in legitimate opposition activity, courts traditionally " 'balance the purpose of [Title VII] to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel.' " *Armstrong,* 647 F.2d at 448 (quoting *Hochstadt v.*

*Worcester Foundation for Experimental Biology*, 545 F.2d 222, 231 (1st Cir.1976)).

[¶ 26] Although the district court found that Sheaffer met the first requirement to establish that a *prima facie* case of retaliation had been met, UW maintains its argument on appeal that Sheaffer failed to meet the first requirement in establishing her *prima facie* case. We agree with UW.

[¶ 27] Sheaffer argues on appeal that she participated in a protected activity—that is, reporting complaints and providing recorded evidence of the "hostile, vulgar, unprofessional, abusive, discriminatory and offensive behavior, language and conduct" of the TAC members—specifically, that her workplace could be defined as a "hostile work environment." In her complaints, Sheaffer repeatedly criticized the TAC members' conduct, saying that they were partial to UW employees, faculty, and student athletes, and that decisions of the TAC generally lacked consistency. Her final act of "protected activity," in her estimation, was presenting the recorded meeting of the TAC to Johnson in an effort to show the hostile work environment.

 [¶ 28] In order for a hostile work environment claim to survive a summary judgment motion,

> a plaintiff must show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

*Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir.1998) (citation omitted). To evaluate whether a working environment is sufficiently hostile or abusive, we examine all the circumstances, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In addition, the environment must be both

subjectively and objectively hostile or abusive. *Id.; see also Davis v. United States Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998).

[¶ 29] The Supreme Court has instructed that courts judging hostility should filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (sex discrimination). This screening is in place to ensure that Congressional enactments do not become trivialized as a civility code. *Id.* In particular, courts should filter out offhand comments and isolated incidents (unless extremely serious).

 [¶ 30] Applying these principles, we find that Sheaffer's allegations regarding the behaviors of the TAC fall short of demonstrating a pervasive or severely hostile work environment. The evidence proffered by Sheaffer includes "hostile, vulgar, unprofessional, abusive, discriminatory and offensive behavior" and gender-based appellate decision-making. Specifically, when considering the TAC's conduct, we cannot conclude that the committee's sometimes off-the-record joking, gossip, and swearing could be considered hostile—perhaps unprofessional, but not hostile. There is no evidence, in our estimation, that a hostile work environment, as is defined by civil rights laws, existed in the instant case. Furthermore, we note that Sheaffer never complained of being personally victimized by the allegedly offensive behavior of TAC members, or even present during their allegedly "vulgar" behavior.

[¶ 31] Even if Sheaffer had met her burden of establishing a *prima facie* case, UW, under its burden, produced legitimate, nondiscriminatory reasons for firing Sheaffer. In fact, UW provided three specific, nondiscriminatory reasons for her termination: (1) significant misconduct and carelessness by engaging in activities (secret audio taping of the [TAC]) which are detrimental to the operations of UW and which impair UW missions, purposes, and objectives as an institution of higher education and which caused an irreversible erosion of trust; (2)

asking a subordinate employee (Paul Kunkel) to implement detrimental activities; and (3) deception and dishonesty in the investigation of the misconduct. UW also explains in the same document listing the reasons for termination that any one of the three reasons given, standing alone, was sufficient cause for termination.

[¶ 32] In view of our discussion above, without a *prima facie* showing of retaliation, Sheaffer's claim fails on appeal.

## Gender Discrimination

[¶ 33] Sheaffer next contends that UW unlawfully discriminated against her on the basis of her gender in violation of Title VII, 42 U.S.C. § 2000e. Similar to our previous discussion, under Title VII, a plaintiff who has received a "right to sue" letter from the EEOC must first make out a *prima facie* case of gender discrimination, thus creating a rebuttable presumption of discrimination. *Bachmeier v. Hoffman,* 1 P.3d 1236, 1243 (Wyo.2000).

[¶ 34] Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for an employer to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a)(1). The United States Supreme Court has made clear that the phrase "terms, conditions, or privileges of employment" reflects a congressional intent "to strike at the entire spectrum of disparate treatment of men and women in employment," including hostile or abusive work environments. *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (citing *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). When the workplace is permeated with discriminatory intimidation, ridicule, and insult of sufficient severity or pervasiveness to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated. *Id.* The anti-discrimination provision seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status.

[¶ 35] UW concedes that Sheaffer met the requirement of showing a *prima facie* case for gender discrimination. Therefore, the burden then shifts to UW to articulate a legitimate, non-discriminatory reason for the adverse employment decision. If the employer meets that burden of production, the presumption created by the *prima facie* case is rebutted and drops from the case. Once the employer meets its burden of production by offering a legitimate rationale in support of its decision, the burden shifts back to the plaintiff to show the employer's proffered reasons were pretextual. The plaintiff must present specific facts significantly probative to support an inference that the employer's proffered justifications were simply a pretext for discrimination. *Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1455 (10th Cir.1994). The plaintiff can demonstrate pretext by showing that either a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence. *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 530 (10th Cir.1994).

[¶ 36] In the instant case, because Sheaffer met her burden of establishing a *prima facie* case, the burden then shifts to UW to articulate a legitimate, non-discriminatory reason for Sheaffer's termination. The burden is of production, not persuasion, which UW easily satisfies. We previously set out UW's reasons for firing Sheaffer, but because this is a different issue, we state them again. UW's three specific, non-discriminatory reasons for her termination were: (1) significant misconduct and carelessness by engaging in activities (secret audio taping of the [TAC]) which are detrimental to the operations of UW and which impair UW's missions, purposes, and objectives as an institution of higher education and which cause an irreversible erosion of trust; (2) asking a subordinate employee (Paul Kunkel) to implement detrimental activities; and (3) deception and dishonesty in the investigation of the misconduct. UW also explained in the same document listing the reasons for termination that any one of the three reasons given alone was sufficient cause for termination.

[¶ 37] Because UW met its burden of production, the burden shifted once again back to Sheaffer to show UW's reasons for termination were not legitimate, but pretextual. Here, Sheaffer argues that she was discriminated against because she is a woman. In support of her argument, she first points to the fact that Kunkel and Lorenz were granted immunity from prosecution during the Albany County Attorney's investigation. However, there is absolutely no evidence that UW in any way affected the grants of immunity issued by the county attorney. Also, Sheaffer contends that pretext abounds because Kunkel and Lorenz were not terminated, but instead only received two-day suspensions without pay. Here, we agree with the district court that while Sheaffer was treated differently than Kunkel and Lorenz, in that she was fired and they were not, the different treatment is explained by a non-discriminatory motive. UW terminated Sheaffer because it concluded, in good faith, that she was dishonest and deceitful during its personnel investigation. UW explained its legitimate reasons for not firing Kunkel or Lorenz—they found both men to be honest, contrite and remorseful during the investigation of the taping incident. Again, UW is not required to be correct in its assessment that Sheaffer was, in fact, dishonest and deceitful; it is only required to have come to its conclusions in good faith and in a non-discriminatory manner.

[¶ 38] UW completed a thorough personnel investigation surrounding the audio taping incident, concluded that Sheaffer was dishonest and deceptive, and relied upon that conclusion in good faith when terminating Sheaffer. This is all that the law can require of an employer. Thus, we can find no discrimination against Sheaffer on the basis of her gender, and the district court is affirmed on this issue.

**Breach of Contract**

[¶ 39] Sheaffer next claims on appeal that UW breached its contract when it fired her. She claims that she was employed pursuant to either an express or implied contract, and that she could only be terminated for cause.

UW, of course, denies that it breached its contract with Sheaffer. Furthermore, and as a threshold issue, UW asserts that Sheaffer is collaterally estopped from asserting in this suit that there was not cause to terminate her because she sought to resolve the breach of contract issue through UniReg 174.

 [¶ 40] We first look to UW's collateral estoppel, or issue preclusion, claim. The doctrine of issue preclusion prevents the relitigation of issues actually and necessarily decided previously in an action between the same parties. Collateral estoppel forecloses relitigation when the issue presented is identical to one determined in a prior proceeding; when the prior proceeding produced a decision on the merits of the issue; when the party against whom issue preclusion is asserted was a party, or in privity with the party, in the prior proceeding; and when the party against whom issue preclusion is asserted had a full and fair opportunity to litigate the issue in the prior proceeding.

*Bender v. Uinta County Assessor,* 14 P.3d 906, 910 (Wyo.2000).

[¶ 41] As Sheaffer points out, UW urges this Court to apply the doctrine of administrative collateral estoppel. However, the doctrine of administrative collateral estoppel cannot be applied to this case because of a legislative change to Wyo. Stat. Ann. § 16–3–101(b)(i) (LexisNexis 2007). That statute now excludes UW from agency status. *See Albertson's, Inc. v. City of Sheridan,* 2001 WY 98, 33 P.3d 161 (Wyo.2001).

 [¶ 42] Accordingly, we turn to Sheaffer's claim that UW breached her implied employment contract and wrongfully terminated her. Though Sheaffer did not have an express employment contract with UW, both parties have assumed that the UniRegs removed Sheaffer from "at-will" employment and allowed her to only be terminated "for cause."

Ordinarily, in implied employment contract cases, a breach of contract is established by the employer's failure to follow the procedures contained in the handbook, by a showing there was no cause for termination, or by both.

*Life Care Centers of America, Inc. v. Dexter*, 2003 WY 38, ¶ 11, 65 P.3d 385, 391 (Wyo. 2003). In order to establish a breach of contract claim based upon a violation of personnel rules, a plaintiff must prove two things: (1) The handbook actually became part of the employment contract, and (2) the terms of the handbook were breached. *Id.*

[¶ 43] Sheaffer asserts that UW violated UniReg 5 in the course of her termination. First, Sheaffer complains that UW committed an act of retaliation against her for reporting harassment and/or discrimination, as defined by UniReg 5.[4] However, Sheaffer's claim regarding retaliation in violation of UniReg 5 fails because she never actually reported her claim that she was terminated in retaliation. Sheaffer had ample opportunity to do so—including at her pre-termination hearing and post-termination dispute resolution proceeding available to her. The post-termination appeal afforded Sheaffer a hearing before an independent hearing examiner, but Sheaffer reached an agreement with UW before that hearing could take place. Without having the opportunity to cure a reported incident, UW cannot be held responsible for a claim to which they were never privy.

[¶ 44] Sheaffer also contends that, allegedly in violation of UniReg 5, UW failed to ensure that the work environment was free of discrimination and harassment; that UW failed to ensure that any report of discrimination and harassment shall be forwarded to the next level; and that Vice President Hardin failed to promptly address any instance of discrimination and harassment. Sheaffer contends that the complaints she received, she reported to her supervisor, defendant Johnson. However, Sheaffer again failed to adhere to the requirements of the UniRegs by not submitting a report to an Employment Practices Officer.

[¶ 45] UW has defined procedures, set out in the UniRegs, providing the process that a UW employee must follow in complaining of discrimination and harassment. These procedures allow UW to investigate and correct the problem. However, UW must learn that a problem exists before it can actually address it. Here, it was Sheaffer, not UW, who did not follow proper procedure. Accordingly, we find no breach of Sheaffer's implied contract with UW.

[¶ 46] Our analysis does not end there, however. Sheaffer can also prove breach of her employment contract by showing that she was terminated without cause. This, essentially, is our "good faith" analysis:

> Under this standard, the question to be resolved by the fact finder is not, " 'Did the employee *in fact* commit the act leading to dismissal?' " Rather, it is, " 'Was the factual basis on which the employer concluded a dischargeable act had been committed reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual?' " "Cause" is defined under this standard as
>
> > fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual. A reasoned conclusion, in short, supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond.

*Life Care Centers of America, Inc.*, ¶ 15, 65 P.3d at 392 (internal citations omitted).

[¶ 47] UW conducted an investigation into the taping incident, from which it concluded that Sheaffer directed the audio recording to be performed, or, at the very least, that Sheaffer had a large hand in ensuring that the taping occurred. Our review of the record shows that the investigation was appropriate and altogether thorough, lasting nearly one month until any disciplinary actions were discussed and recommended. Notes taken by Johnson, who primarily conducted the internal UW investigation, and Vice President Hardin, pro-

---

4. UniReg 5 defines retaliation as:

 Adverse action or threat made in reprisal against any individual who participates as an actual or potential party, witness or representative relating to a report of discrimination or harassment as authorized by this policy.

 University Regulation 5, Rev. 1 (Mar. 2005).

vide a chronology of the investigation itself and the considerations each person took into account in reaching their disciplinary decisions.

[¶ 48] Furthermore, other facts support UW's decision to terminate Sheaffer, among them that Sheaffer initially did not tell Johnson that an audio tape of the TAC meeting existed, that Sheaffer directed Johnson not to speak to Kunkel about the audio tape, and that Sheaffer requested that Johnson return "her" audio tape and tape recorder, though it was, in fact, purchased by UW. Johnson concluded that Kunkel was honest throughout the investigation, and even remorseful for his participation in the audio recording. After Johnson's investigation, he, along with Hardin, concluded that termination was proper.

[¶ 49] The question on appeal is not who taped the meeting, or even who ordered the taping, but rather, did UW act in good faith in terminating Sheaffer? After a thorough review of the record, we can confidently conclude that UW did act in good faith.

**Interference with Contract**

 [¶ 50] Sheaffer's final argument on appeal is that Bruce Hooper and Kevin White, as individuals, wrongfully interfered with her implied employment contract with UW. Specifically, Sheaffer complains that Hooper and White both "urged" Johnson to terminate Sheaffer. She argues that whether or not that was within the scope of their duties as UW employees is a question for the jury to ponder, making it inappropriate for summary judgment. Also, Sheaffer contends that Hooper failed to perform random drug testing and granted appeals specifically to decrease TransPark's revenue.

 [¶ 51] In *Gore v. Sherard*, 2002 WY 114, ¶ 13, 50 P.3d 705, 710 (Wyo.2002), this Court established the elements for interference with a contract:

> In Wyoming, the following elements must be demonstrated to sustain a cause of action for tortious interference with a contract or prospective economic advantage: (1) The existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectan-

cy on the part of the interferer; (3) intentional and improper interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. [Citations omitted.]

The plaintiff has the burden of proving the four elements of intentional or tortious interference with a contract. *Id.* Whether or not interference with a contract was improper is a question of fact. Here, Sheaffer fails to establish any facts supporting her claims against either Hooper or White. We find no direct evidence in the record regarding Sheaffer's claims that Hooper failed to drug test, or that he granted traffic appeals specifically to decrease Sheaffer's department's revenue.

[¶ 52] As to Sheaffer's claim that Hooper and White improperly interfered with her contractual relationship with UW, we also find the record lacking in evidence to support that claim. Mr. Johnson interviewed both Hooper and White (separately) regarding the taping incident, during his investigation. During those separate interviews, Hooper, when asked, "What do you feel should be done about what happened?" replied that Sheaffer should either be punished with unpaid leave, or fired. When asked the same question, White replied that Sheaffer should either be removed from her position as manager of TransPark or "mainly fired."

[¶ 53] Hooper and White were interviewed as part of UW's official internal investigation regarding the taping incident. Other committee members were also questioned, and everyone interviewed was asked the same set of questions. Furthermore, the investigation was conducted during business hours. There is, accordingly, no evidence that either Hooper or White was acting outside the scope of their employment or that their actions were legally improper. *Bear v. Volunteers of America, Wyo., Inc.*, 964 P.2d 1245, 1248–1254 (Wyo.1998). It is clear that Sheaffer failed to meet her burden of proof of the four elements of a cause of action for tortious interference with a contractual relationship or business expectancy.

## CONCLUSION

[¶ 54] No genuine issues of material fact exist on Sheaffer's claims on appeal. Both her gender discrimination claim and hostile work environment claim fail to raise further questions. There was no breach of contract by UW. Furthermore, we find nothing in the record to support her claims against the individuals Hooper and White for interference with a contract.

[¶ 55] The district court is affirmed in all respects.